IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

     **Plaintiff,**

       v.                  **CRIMINAL NO. 24-279 (RAM)**

[2] JORGE SIBERÓN-FLUSA,

     **Defendant.**

---

**OPINION AND ORDER**

RAÚL M. ARIAS-MARXUACH, United States District Judge.

    Pending before the Court is Defendant Jorge Siberón-Flusa's ("Mr. Siberón-Flusa" or "Defendant") *Motion to Suppress* and the Government's *Opposition* thereto. (Docket Nos. 90 and 92). Having held a suppression hearing on November 26, 2025 and December 8, 2025, and having reviewed the parties' arguments and evidence,[1] the Court hereby **GRANTS IN PART** Defendant's *Motion to Suppress.*

**I.   PROCEDURAL BACKGROUND**

    Following a federal criminal investigation and a Criminal Complaint,[2] on August 22, 2024, a Grand Jury issued a three-count Indictment charging Mr. Siberón-Flusa with conspiracy to possess

---

[1] The Court also considered Defendant's *Reply* to the Government's *Opposition* and the parties' post-hearing supplemental briefs. (Docket Nos. 99, 122, and 125).

[2] Docket No. 1.

with intent to distribute a controlled substance, in violation of
21 U.S.C. §§ 841(a)(1)&(b)(1)(A)(ii) and 846 (Count 1); aiding and
abetting possession with intent to distribute a controlled
substance, in violation of 21 U.S.C. §§ 841(a)(1)&(b)(1)(A)(ii)
(Count 2); and possession of a firearm in furtherance of a drug
trafficking crime, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)
and 2 (Count 3). (Docket No. 23). Specifically, the Indictment
charged Defendant with knowingly possessing with intent to
distribute 400 grams or more of fentanyl and with knowingly
possessing a Glock pistol, G19, 9mm, bearing serial number BHKD576,
loaded with ammunition in furtherance of a drug trafficking crime.
Id. at 1.

On September 15, 2025, Defendant filed the pending *Motion to
Suppress*. (Docket No. 90). Mr. Siberón-Flusa alleges that on August
1, 2024, he visited co-Defendant Eliezer Valdés-Ramírez's ("Mr.
Valdés-Ramírez" or "co-Defendant") residence at 148 Calle
Igualdad, Caguas, Puerto Rico, and that he signed and received a
parcel on behalf of co-Defendant. Id. at 2. According to Defendant,
he placed the parcel in his vehicle and began to transport it to
another location at the request of Mr. Valdés-Ramírez. Id. Shortly
thereafter, United States Drug Enforcement Administration ("DEA")
agents stopped his vehicle and arrested him. Id. at 3. Mr. Siberón-
Flusa alleges that DEA agents proceeded to ask unwarned,
unconstitutional questions and conduct a warrantless, illegal

search of his vehicle. Id. at 8-17. Defendant claims that he was removed from his vehicle by several armed DEA agents, restrained by two DEA agents toward the back of the vehicle, and asked aggressively about the whereabouts of a weapon. Id. at 2-3. He admits that he told the agents that there was a weapon under the front driver's seat of the car. Id. at 2-3. He also alleges that he was restrained in such a fashion that he could not reach inside the vehicle or access any weapon. Id. at 3. As a result of Mr. Siberón-Flusa's statement and the agent's search of the vehicle, the DEA seized the following: a package containing approximately 10,000 fentanyl-laced pills stamped "M-30";[3] a stolen Glock pistol, G19, 9mm, bearing serial number BHKD576, with a thirty-three (33) round extended 9-millimeter Glock magazine containing thirty-one (31) rounds of 9-millimeter ammunition inserted into the pistol with an empty chamber; a twenty-four (24) round 9-millimeter Glock magazine containing twenty-three (23) rounds of 9-millimeter ammunition; and a fifteen (15) round 9-millimeter Glock magazine containing fifteen (15) rounds of 9-millimeter ammunition. (Docket No. 92 at 3). Finally, Mr. Siberón-Flusa asserts that the unwarned statements he made during an interview in an unmarked car and a visit to the hospital were obtained illegally, and that any subsequent statements and the seizure and extraction of his

---

[3] Prior to the controlled delivery of the parcel, Drug Enforcement Agency ("DEA") and United States Postal Service ("USPS") agents removed the fentanyl pills and replaced them with decoys ("fake drugs"). (Docket No. 113 at 41).

cellphone should be suppressed as "fruit of the poisonous tree."
(Docket No. 90 at 18).

    The Government filed an *Opposition* questioning Defendant's
Fourth Amendment standing and arguing that the seizure of the
parcel was covered by a tracking warrant, that the agents had
probable cause to stop the vehicle, and that the public safety
exception, automobile exception, and plain view doctrines applied.
(Docket No. 92). The Government asserts that Defendant had no
legitimate expectation of privacy in the package he transported
because it was subject to a tracking warrant. Id. at 8. The
Government also alleges that the presence of the parcel known to
contain fentanyl-laced pills gave the DEA agents probable cause to
believe Defendant was committing a drug trafficking offense and,
therefore, to stop the vehicle. Id. at 8-10. Additionally, the
Government posits that the automobile exception applies because
Defendant's car was readily mobile and probable cause existed to
search the vehicle. Id. at 10. The Government further submits that
the public safety exception applies because the narrowly tailored
questions about the presence of a weapon were geared towards
ensuring the agent's safety and the safety of the public. As to
the plain view doctrine, the Government maintains that it applies
because the parcel, located on the front passenger seat, and two
magazines, located in the driver's side door, were in plain view
of the DEA agents. Id. at 11. Finally, the Government posits that

Defendant's unwarned statements in the police vehicle do not taint his post-Miranda statements, that his statements at the hospital were voluntary, and that he authorized the search of his cellphone. Id. at 14.

On November 26, 2025 and December 8, 2025, the Court held a suppression hearing. (Docket Nos. 113 and 119). At the hearing, Defendant and the Government jointly presented the arresting officers' body camera footage. Defendant presented his partner's, Ms. Nayshaliz Mulero-Bezares ("Ms. Mulero-Bezares"), testimony about her ownership of the vehicle and Mr. Siberón-Flusa's use of it. The Government presented the testimonies of DEA Special Agent Christopher Johnson ("SA Johnson"), DEA Special Agent René Gutiérrez ("SA Gutiérrez"), DEA Task Force Officer Israel Román-Rodríguez, ("TFO Román-Rodríguez"), and DEA Task Force Officer Abimael Zayas ("TFO Zayas") as to the circumstances relating to Defendant's arrest, his questioning, and the search of the vehicle. During the hearing, the parties stipulated the following facts:

1. The parcel that was seized was delivered to and received by Defendant at 148 Calle Igualdad, Caguas, Puerto Rico, as testified to by SA Johnson;

2. After Defendant received the parcel, he got in a vehicle with the parcel, drove off in that vehicle and was subsequently arrested in it with the parcel;

3. When Defendant received the parcel, it did not have drugs inside because the drugs had already been removed from the parcel, as testified to by SA Johnson. (Docket No. 113 at 84).

## II.  FACTUAL BACKGROUND

Considering the parties' stipulations, the testimony and the evidence presented at the November 26, 2025 and December 8, 2025 suppression hearing, the Court makes the following relevant findings of fact:

1. On July 31, 2024, Magistrate Judge Héctor Ramos-Vega issued federal search warrant 24-704(M) authorizing the search of USPS parcel EI 993 508 764 US.

2. DEA agents discovered approximately 10,000 fentanyl-laced pills stamped "M-30" after executing the warrant.

3. On August 1, 2024, Magistrate Judge Héctor Ramos-Vega issued an anticipatory search warrant for 148 Calle Igualdad, Caguas, Puerto Rico, and a tracking warrant for the parcel.

4. DEA and USPS agents replaced the 10,000 fentanyl-laced pills in the parcel with decoys and placed a tracking device inside the parcel.

5. On August 1, 2024, the parcel was delivered to and received by Defendant at 148 Calle Igualdad, Caguas, Puerto Rico, as testified to by SA Johnson.

6. Mr. Siberón-Flusa and the black Nissan Sentra were not a part of the criminal investigation in this case before August 1, 2024.

7. When Defendant received the parcel, it did not have drugs inside; the drugs had already been removed from the parcel, as testified to by SA Johnson.

8. After Defendant received the parcel, he got in a black Nissan Sentra with the parcel and drove off in that vehicle.

9. Ms. Mulero-Bezares owns the black Nissan Sentra.

10. Ms. Mulero-Bezares shared the car with Mr. Siberón-Flusa, and he had free use of it during the day while his own car was inoperable.

11. The DEA agents did not have a warrant to search the black Nissan Sentra.

12. Shortly after Defendant drove off in the black Nissan Sentra, DEA vehicles intercepted it.

13. DEA agents exited their vehicles, opened the driver's side door, removed Defendant from the vehicle, and arrested him.

14. At the time the vehicle was intercepted, there were approximately armed eight agents involved in the operation.

15. The parcel was located on the front passenger side seat of the vehicle.

16.  Two DEA agents restrained Mr. Siberón-Flusa with his
     arms behind his back, placed handcuffs on him, and held
     him near the trunk of the vehicle while other agents
     "cleared" it.[4]

17.  The vehicle was secured in place and inaccessible to Mr.
     Siberón-Flusa.

18.  While Defendant was restrained by two agents towards the
     trunk of the vehicle, SA Gutiérrez asked Defendant if he
     had a firearm to which Mr. Siberón-Flusa answered in the
     affirmative.

19.  SA Gutiérrez followed up by asking where the gun was, to
     which Mr. Siberón-Flusa responded by saying that there was
     a gun under the driver seat.

20.  Mr. Siberón-Flusa had not been given Miranda warnings
     prior to these questions.

21.  The DEA agents had no previous suspicion that there were
     firearms in the car, and they did not have a warrant for a
     firearm.

---

[4] According to SA Johnson's testimony, clearing the vehicle involves removing
all personnel that are inside the vehicle. (Docket 113 at 35). Specifically,
clearing the "entire vehicle, front seats, back seats, trunk even, and make
sure that there's nobody that can do us or any civilians harm, make sure there's
no weapons [. . .] [a]nything that can hurt us or the civilian population we
want to make sure that it's not a threat to anybody." Id. at 35-36.

22.  It was only by Mr. Siberón-Flusa's affirmation as to the fact that there was a weapon in the car that the DEA agents searched under the driver seat.

23.  Special Agent Daniel Galvas removed a stolen Glock pistol, G19, 9mm, bearing serial number BHKD576 with a thirty-three (33) round extended 9-millimeter Glock magazine containing thirty-one (31) rounds of 9-millimeter ammunition inserted into the pistol with an empty chamber from under the driver seat.

24.  DEA agents also recovered a twenty-four (24) round 9-millimeter Glock magazine containing twenty-three (23) rounds of 9-millimeter ammunition and a fifteen (15) round 9-millimeter Glock magazine containing fifteen (15) rounds of 9-millimeter ammunition from the front driver's side door of the vehicle.

25.  DEA agents seized a cellphone from Defendant's person at the time of the arrest.

26.  Around 12:15 p.m. on August 1, 2024, Defendant was moved to an unmarked vehicle at which point TFO Román-Rodríguez asked him where he was going with the parcel, to which Mr. Siberón-Flusa responded that he was told to take it to Mr. Valdés-Ramírez's grandmother's house.

27.  TFO Román-Rodríguez then asked if Defendant could point out the location of the house on a map and he did so.

28.  Mr. Siberón-Flusa was not given Miranda warnings prior to TFO Román-Rodríguez's questions.

29.  While in the unmarked vehicle, Defendant then said, "I don't even know why I took that box."

30.  Around 12:40 p.m. on August 1, 2024, inside the unmarked vehicle, TFO Román-Rodríguez gave Mr. Siberón-Flusa Miranda warnings and Defendant waived them.

31.  DEA Special Agent Felix Flores ("SA Flores") was also present when Defendant waived his Miranda rights.

32.  At 12:58 p.m., Defendant signed a consent for his cellphone to be searched and provided the password for it.

33.  After signing both the Miranda waiver and consent to the phone search, Mr. Siberón-Flusa had a 10-25-minute interview with SA Román-Rodríguez.

34.  SAs Flores, Zayas and Román transported Mr. Siberón-Flusa to the DEA offices in Guaynabo.

35.  At 5:15 p.m., TFO Zayas gave Mr. Siberón-Flusa Miranda warnings in the DEA offices and, again, Defendant waived them.

36.  TFO Zayas conducted an interview with Defendant after he signed the Miranda waiver.

37.  Around 8 p.m., Defendant was in his cell and said he was not feeling well.

Criminal No. 24-279 (RAM)                                              11

38. Due to Defendant's heart condition, TFO Zayas and SA Flores took Defendant to the Cardiovascular Hospital in San Juan.

39. While in a private room at the hospital, Defendant told TFO Zayas and SA Flores that he remembered that Mr. Valdés-Ramírez bought a pickup truck and a BMW SUV from "El Negro," the Turabo Heights big shot, using 10,000 pills.

40. Mr. Siberón-Flusa was cleared by the doctors and taken to detention in Carolina.

### III. LEGAL STANDARD

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In light of this Constitutional prohibition against unreasonable searches and seizures, "a search of an arrestee's vehicle [is] unreasonable unless police obtain a warrant or show that [an] exception to the warrant requirement applies." Arizona v. Gant, 556 U.S. 332, 351 (2009). Moreover, the Supreme Court has explained that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are **per se unreasonable** under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967) (emphasis added).

In the case at bar, Defendant challenges the legality of the warrantless search of the vehicle he was driving. "On a motion to suppress evidence seized on the basis of a warrantless search, the presumption favors the defendant, and it is the government's burden to demonstrate the legitimacy of the search." United States v. Delgado-Perez, 867 F.3d 244, 250 (1st Cir. 2017) (quoting United States v. Winston, 444 F.3d 115, 123-24 (1st Cir. 2006)).

## IV.  STANDING

As a threshold matter, the Government contests whether Defendant has standing to raise a Fourth Amendment claim. "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." Rakas v. Illinois, 439 U.S. 128, 132, n. 1 (1978). To meet this burden, the defendant "must show that he had a reasonable expectation of privacy in the area searched and in relation to the items seized." United States v. Aguirre, 839 F.2d 854, 856 (1st Cir. 1988). In Aguirre, the First Circuit established a two-tier test for reasonable expectation of privacy. First, courts must determine "whether or not the individual thought of the place (or the article) as a private one, and treated it as such."  Id. at 857. The following factors are relevant to this inquiry: "ownership, possession, and/or control; historical use of the property searched, or the thing seized; ability to regulate access; the totality of the surrounding

circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case." Id. at 856–57. If the defendant satisfies this first step, courts must "then look to whether or not the individual's expectation of confidentiality was justifiable under the attendant circumstances." Id. at 857. "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, ownership alone is not dispositive." United States v. Garcia-Robledo, 488 F. Supp. 2d 50, 63 (D.P.R. 2007) (citing United States v. Salvucci, 448 U.S. 83, 91 (1980); Rawlings v. Kentucky, 448 U.S. 98, 105 (1980)). Courts should also consider "any precautions taken to exclude others or otherwise maintain a privacy interest." Garcia-Robledo, 488 F. Supp. 2d. at 63. (citations omitted).

The Government argues that, because Mr. Siberón-Flusa is not the owner of the vehicle searched, he did not have a reasonable expectation of privacy in it and, consequently, does not have standing to challenge its search. (Docket Nos. 113 at 13). At the suppression hearing, Ms. Mulero-Bezares testified that she is the owner of the black Nissan Sentra. However, she further noted that Defendant lived with her and habitually used the black Nissan Sentra. Id. She testified that while Defendant owned a vehicle, it was inoperable at the time of the relevant events. Id. at 7.

Considering this testimony, during the hearing the Court found that Mr. Siberón-Flusa established standing in challenging the search of the black Nissan Sentra. Id. at 25. The Court ruled that Defendant has standing because Ms. Mulero-Bezares shared the vehicle with him and he had free use of it during the day while his own car was inoperable. Id.

## V.    DISCUSSION

First, the Court underlines the fact that the DEA agents in this case knew that the parcel contained 10,000 pills of fentanyl, or rather the decoy drugs they had replaced them with, when they executed the controlled delivery and Mr. Siberón-Flusa received it. (Docket No. 113 at 41). In Illinois v. Andres, the Supreme Court held that "[n]o protected privacy interest remains in contraband in a container once government officers lawfully have opened that container and identified its contents as illegal." 463 U.S. 756, 771 (1983). Here, the controlled delivery package had been opened pursuant to a valid search warrant, and the "simple act of resealing the container to enable the police to make a controlled delivery does not operate to revive or restore the lawfully invaded privacy rights." Id. at 771-772 (finding "once a container has been found to a certainty to contain illicit drugs, the contraband becomes like objects physically within the plain view of the police, and the claim to privacy is lost"); see also United States v. Ruiz-Ruiz, No. CR 22-232 (RAM), 2025 WL 1378659

(D.P.R. May 13, 2025). While the controlled substances were removed from the package before the container was resealed, such a removal does not affect this assessment. If there are large gaps in surveillance, it is possible a container could be put to other uses, but the "likelihood that this will happen depends on all the facts and circumstances, including the nature and uses of the container, the length of the break in surveillance, and the setting in which the events occur." Id. at 772. Here, approximately 30 seconds elapsed between the controlled delivery of the parcel and the moment the DEA agents saw Defendant board the black Nissan Sentra with the parcel in hand. (Docket No. 113 at 31); *see* Andres, 463 U.S. at 773 (holding "absent a substantial likelihood that the contents have been changed, there is no legitimate expectation of privacy in the contents of a container previously opened under lawful authority"). Accordingly, the DEA agents could not reasonably conclude that the contents of the package had been changed. Hence, Defendant had no legitimate expectation of privacy in the contents of the parcel.

Under the "plain view doctrine," a warrantless seizure is lawful if the following three elements are met: "(i) the police officer who effects the seizure lawfully reaches the vantage point from which he sees an object in plain view; (ii) probable cause exists to support his seizure of that object; and (iii) he has a right of access to the object itself." United States v. Sanchez,

Criminal No. 24-279 (RAM)                                        16

612 F.3d 1, 4-5 (1st Cir. 2010) (citing <u>United States v. Allen</u>, 573
F.3d 42, 51 (1st Cir. 2009); <u>United States v. Antrim</u>, 389 F.3d 276,
283 (1st Cir. 2004)). When "a seizure of items in plain view is
supported by probable cause, an inquiring court will not look
behind that justification." <u>Sanchez</u>, 612 F.3d at 6.

Here, DEA agents lawfully stationed on the street saw Mr.
Siberón-Flusa board the black Nissan Sentra in plain view with the
parcel known to contain contraband in hand. Therefore, they had
probable cause to believe Defendant was committing a crime.
Specifically, a drug trafficking offense. Consequently, DEA agents
had limited authority to stop the vehicle, arrest Defendant, and
seize the parcel.

Therefore, the questions before the Court are: (1) whether
the DEA agents lawfully questioned Defendant without issuing
Miranda warnings; (2) whether DEA agents lawfully searched the
vehicle and seized property without a warrant; and (3) whether
Defendant's post-Miranda warning statements and the search of his
cellphone are "fruit of the poisonous tree."

The Government submits that questioning Mr. Siberón-Flusa as
to the whereabouts of a weapon was lawful under the public safety
exception because the narrowly tailored questions about the
presence of a weapon were geared towards ensuring the agent's
safety and the safety of the public. The Government also maintains
that the seizure of two gun magazines, located in the front

driver's side door, was legitimate because they were in plain view of the DEA agents. (Docket No. 92 at 11). Moreover, the Government contends that the search of the vehicle was justified under the automobile exception because Defendant's car was readily mobile and probable cause existed to search the vehicle. Id. at 10. Finally, the Government avers that Defendant's unwarned statements in the police vehicle do not taint his post-Miranda statements, that his statements at the hospital were voluntary, and that he authorized the search of his cellphone. Id. at 14. The Court shall address the credibility of testifying witnesses and the applicability of the Government's purported warrant and Miranda warning exceptions below.

## A. THE PUBLIC SAFETY EXCEPTION

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Consequently, before conducting a "custodial interrogation" of a suspect, law enforcement officers must provide Miranda warnings to the suspect as a procedural safeguard for his or her Fifth Amendment rights. See Miranda v. Arizona, 384 U.S. 436, 444 (1966). Hence, "the need for a Miranda warning turns on whether a suspect is in custody." United States v. Swan, 842 F.3d 28, 31 (1st Cir. 2016) (quotation marks and citation omitted).

Courts typically apply a two-part test to determine if a person is in custody for Miranda purposes. First, "the court

examines the circumstances surrounding the questioning," and second, "sees whether those circumstances would cause a reasonable person to have understood his situation to be comparable to a formal arrest." United States v. Guerrier, 669 F.3d 1, 6 (1st Cir. 2011) (citations omitted). This analysis is guided by various factors, including but not limited to "where the questioning occurred, the number of officers, the degree of physical restraint, and the duration and character of the interrogation." Id. (quoting United States v. Teemer, 394 F.2d 59, 66 (1st Cir. 2005)). Accordingly, individuals who are taken into custody and subject to questioning by law enforcement must be given a warning about the right to an attorney, among other rights. Id. at 479. A suspect may waive the Miranda rights and consent to an interrogation, but the waiver must be voluntary, knowing, and intelligent. *See* Edwards v. Arizona, 451 U.S. 477, 484 (1981). The district court "must start with a presumption that the suspect did not waive his rights," and the government bears the burden of proving waiver by a preponderance of the evidence. United States v. Carpentino, 948 F.3d 10, 26 (1st Cir. 2020).

The Government does not contest that SA Gutiérrez's unwarned questions about the whereabouts of a weapon constitute a custodial interrogation. As such, and given the degree of physical restraint of Defendant and the approximately eight armed DEA agents present, the Court finds that SA Gutiérrez's questions constitute a

custodial interrogation. The next question is whether an exception to _Miranda_ applies.

The Government posits that Mr. Siberón-Flusa's answers fall within the public safety exception. (Docket No. 92 at 12). The Government maintains that, given the risks associated with firearms and narcotics trafficking and given that there were neighbors nearby at the time of arrest, a limited unwarned questioning aimed at ensuring officer safety and securing contraband is admissible. _Id._ To support this proposition, they cite the Supreme Court's decision in _New York v. Quarles_ which found that a defendant's initial statement indicating the whereabouts of a gun was admissible despite the officer's failure to read the defendant his Miranda rights before attempting to locate the weapon. 467 U.S. 649 (1984). The Supreme Court ruled this way in view of the existence of a "public safety" exception to the requirement that Miranda warnings be given before a suspect may be questioned. _Id._

In _Quarles_, the defendant was apprehended in a supermarket. _Id._ at 652. Upon frisking the defendant, the arresting officer realized he had an empty gun shoulder holster. _Id._ The arresting officer asked the defendant about the whereabout of the gun, and he signaled that it was by some empty cartons. _Id._ There, the police officers had "the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the

suspect had just removed from his empty holster and discarded in the supermarket." Id. At 657. This posed a threat to public safety because if "the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown [. . .] an accomplice might make use of it, a customer or employee might later come upon it." Id. Hence, "that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id. at 657.

Based on the evidence presented at the suppression hearing, the facts in New York v. Quarles are clearly distinguishable from this case and such distinction makes the public safety exception inoperable here. Per the DEA agents' testimony and the body camera footage, Mr. Siberón-Flusa was already restrained near the trunk of the vehicle, with his hands behind his back, when SA Gutiérrez asked him about the whereabouts of a weapon. In fact, upon arresting Defendant, the DEA agents had no indicia that there was a weapon in the vehicle.[5] (Docket No. 113 at 100). Moreover, approximately eight DEA agents surrounded the vehicle and verified that no other people were inside it. Although the Government points to the presence of neighbors nearby, no evidence was presented to

_____

[5] For this reason, this case is also distinguishable from U.S. vs. Shea, which the Government cites, where the First Circuit upheld an agent's unwarned question about the whereabouts of a gun after the defendant's attempted armed bank robbery. 150 F.3d 44 (1st Cir. 1998).

establish that these neighbors or Mr. Siberón-Flusa could possibly access the car or any weapon therein. Therefore, the Government did not evince an immediate necessity of ascertaining the whereabouts of a gun or demonstrate that agents had reason to believe Defendant possessed a gun. Thus, the public safety exception is inapposite here.

## B. THE AUTOMOBILE EXCEPTION OR SEARCH INCIDENT TO ARREST

The Government maintains that the search whereby DEA agents found the Glock pistol under the driver seat is lawful under the automobile exception to warrantless searches of vehicles. Defendant argues that the search-incident-to-arrest doctrine is applicable and that the search in this case fails under the exception set forth in <u>Gant</u>. 556 U.S. at 347.

On the one hand, the automobile exception provides an exception to the search and seizure warrant requirement, providing that "[i]f there is probable cause to believe a vehicle contains evidence of criminal activity," agents can search without a warrant "any area of the vehicle in which the evidence may be found." <u>Gant</u>, 556 U.S. at 347 (2009) (discussing <u>United States v. Ross</u>, 456 U.S. 798, 820-821(1982). In <u>Carroll v. United States</u>, the Supreme Court found that, given the nature of an automobile in transit, an immediate intrusion is necessary if police officers are to secure the illicit substances. 267 U.S. 132 (1925); *see also* <u>United States v. Polanco</u>, 634 F.3d 39 (1st Cir. 2011).

On the other hand, in Gant, the Supreme Court recognized that a
vehicle could fall into the search-incident-to-arrest doctrine and
not the automobile exception in some cases. Polanco, 634 F. 3d at
42 (citing Gant, 267 U.S. at 343). Specifically, it found that
vehicle search may fall within the search-incident-to-arrest
doctrine in two situations: "when the arrestee is unsecured and
within reaching distance of the passenger compartment at the time
of the search (the officer-safety justification), or when it is
reasonable to believe evidence relevant to the crime of arrest
might be found in the vehicle (the evidence-preservation
justification)." Id. (quotations omitted). "The auto exception is
distinct from the evidence-preservation component of Gant's
search-incident-to-arrest analysis" because "the auto exception
extends beyond the crime of arrest" while Gant does not extend to
evidence of other offenses. Polanco, 634 F. 3d at 42. Also, "the
auto exception requires probable cause" while Gant "only requires
a 'reasonable basis.'" Id. It is important to note that in Carroll,
Ross, and Polanco, the contraband that law enforcement had probable
cause to believe was in the vehicle was not in plain view.

In the case at bar, the DEA agents had probable cause to
believe that Mr. Siberón-Flusa was committing a drug trafficking
offense because he boarded the black Nissan Sentra holding a parcel
known to contain approximately 10,000 fentanyl pills. Thus, they

Criminal No. 24-279 (RAM)                                              23

had probable cause to stop the vehicle which contained such contraband.

However, prior to Mr. Siberón-Flusa accepting the parcel and boarding the black Nissan Sentra with it, he was not subject to the criminal investigation that led to the controlled delivery; nor did the DEA agents have any knowledge of him. (Docket No. 113 at 62-63). Moreover, once the DEA agents intercepted the vehicle and arrested Defendant, they found the parcel on the front passenger seat, in plain view. (Docket No. 113 at 36-37).

While the automobile exception can extend beyond the crime of arrest, it requires probable cause. The Government presented no evidence to establish that the DEA agents had probable cause to believe Mr. Siberón-Flusa had any contraband apart from the readily identified parcel or that they had probable cause to believe he was committing any other crime. In fact, SA Gutiérrez admitted that before Defendant told him there was a weapon in the car, they had no other indicia there was a weapon in the vehicle. (Docket 113 at 100). Therefore, the automobile exception does not operate here. The Court now examines the facts of this case under Gant and the search-incident-to-arrest doctrine.

Under Gant, a warrantless search of a vehicle falls under the search-incident-to-arrest doctrine "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search" or "when it is reasonable to believe evidence

Criminal No. 24-279 (RAM)                                                    24

relevant to the crime of arrest might be found in the vehicle."
Polanco, 634 F. 3d at 42 (citing Gant, 267 U.S. at 343). That is,
the search-incident-to-arrest doctrine exists to ensure officer
safety and to preserve evidence. Consequently, law enforcement
officers "may search a vehicle incident to a recent occupant's
arrest only if the arrestee is within reaching distance of the
passenger compartment at the time of the search or it is reasonable
to believe the vehicle contains evidence of the offense of arrest."
Gant, 556 U.S. at 351.

Here, the search of the vehicle was conducted after Mr.
Siberón-Flusa was removed from the vehicle, while he was being
held by two DEA agents with his hands behind his back towards the
trunk of the vehicle, while the vehicle was surrounded by
approximately eight DEA agents, and while the parcel sat atop the
front passenger seat of the car. In other words, he was secured,
he was not within reaching distance of the passenger compartment
at the time of arrest, and the evidence relevant to the crime of
arrest was in plain view of the DEA officers without them
conducting a search of the vehicle. Consequently, the search-
incident-to-arrest exception established in Gant is also
inapplicable in this case. Therefore, the Glock pistol was
unlawfully seized.

Criminal No. 24-279 (RAM)                                              25

## C. THE PLAIN VIEW DOCTRINE

The Government alleges that the two gun magazines recovered from the driver side door of the vehicle were in plain view of the DEA agents, and that their seizure was lawful. As we have established, under the "plain view doctrine," a warrantless seizure is lawful if the following three elements are met: "(i) the police officer who effects the seizure lawfully reaches the vantage point from which he sees an object in plain view; (ii) probable cause exists to support his seizure of that object; and (iii) he has a right of access to the object itself." Sanchez, 612 F.3d at 4-5 (citing Allen, 573 F.3d at 51; Antrim, 389 F.3d at 283).

In this case, the DEA agents had sufficient probable cause to intercept the vehicle and arrest Defendant. To do so, they opened the driver side door and removed Mr. Siberón-Flusa from the vehicle. As per the body camera footage, once the DEA agents opened the driver side door, they could observe the contents of the compartment in the driver side door from their vantage point. Given the nature of the objects and given that the front driver's side door was open, the DEA agents had a right to access and probable cause to seize the two gun magazines. Therefore, the two gun magazines were lawfully seized.

### D. UNWARNED STATEMENTS, VOLUNTARY STATEMENTS AND CONSENT TO SEARCH

#### i.  Unwarned Statements

Around 12:15 p.m. on August 1, 2024, Defendant was moved to an unmarked vehicle at which point TFO Román-Rodríguez asked him where he was going with the parcel, to which Mr. Siberón-Flusa responded that he was told to take it to Mr. Valdés-Ramírez's grandmother's house. (Docket No. 119 at 13-15). TFO Román-Rodríguez then asked if Defendant could point out the location of the house on a map and he did so. Id. As per SA Román's testimony, he spoke to Defendant for around forty minutes and then issued Miranda warnings to Mr. Siberón-Flusa at 12:40 p.m. Id. Defendant signed a waiver of his Miranda rights at that time. Id.

Mr. Siberón-Flusa argues that all unwarned statements made prior to the 12:40 p.m. waiver should be suppressed; the Government offers no exception to Miranda that could possibly cover them. Individuals who are taken into custody and subject to questioning by law enforcement must be given a warning about the right to an attorney, among other rights. Miranda, 394 U.S. at 479. Absent an exception to Miranda, unwarned statements are obtained in violation of the Fifth Amendment and are, as such, inadmissible.

#### ii.  Voluntary Statements

Around 8 p.m. on August 1, 2024, Defendant was in his cell and said that he was not feeling well. (Docket No. 119 at 21-24).

Due to Defendant's heart condition, TFO Zayas and SA Flores took Defendant to the Cardiovascular Hospital in San Juan. Id. While in a private room at the hospital, Defendant told TFO Zayas and SA Flores that he remembered that Mr. Valdés-Ramírez bought a pickup truck and a BMW SUV from "El Negro," the Turabo Heights big shot, using 10,000 pills. Id. Mr. Siberón-Flusa was cleared by the doctors and taken to detention in Carolina. Id.

The Fifth Amendment requires suppression only of statements obtained through custodial interrogation. Miranda, 384 U.S. at 444. The Supreme Court has found that Miranda safeguards apply only when a suspect in custody is subjected to "express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). This includes "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. Hence, "[v]olunteered statements of any kind are not barred by the Fifth Amendment." Id. at 300. "[T]he finder of fact must examine the surrounding circumstances, and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." Oregon v. Elstad, 470 U.S. 298, (1985). However, "[t]he fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." Id.

In this case, Defendant does not allege any coercive or improper tactics utilized by the DEA agents to elicit a statement. Defendant had been read his Miranda rights twice, at 12:40 p.m. and at 8 p.m., prior to the statements at the hospital, and he expressed the statements voluntarily, without prompting from the DEA agents. Therefore, the statements Mr. Siberón-Flusa made at the hospital are not precluded by Miranda.

### E. POST-MIRANDA STATEMENTS AND THE APPLICATION OF THE EXCLUSIONARY RULE

Around 12:40 p.m. on August 1, 2024, inside the unmarked vehicle, TFO Román-Rodríguez gave Mr. Siberón-Flusa Miranda warnings and Defendant waived them. (Docket No. 119 at 15). SA Flores was also present when Defendant waived his Miranda rights. Id. at 16. After signing the Miranda waiver, Mr. Siberón-Flusa had a 10-25-minute interview with SA Román. Id. at 18. SAs Flores, Zayas, and Román transported Mr. Siberón-Flusa to the DEA offices in Guaynabo. Id. at 19. At 5:15 p.m., TFO Zayas gave Mr. Siberón-Flusa Miranda warnings in the DEA offices and, again, Defendant waived them. Id. at 69. TFO Zayas conducted an interview with Defendant after he signed the Miranda waiver. Id.

A suspect may waive the Miranda rights and consent to an interrogation, but the waiver must be voluntary, knowing, and intelligent. See Edwards, 451 U.S. at 484. The district court "must start with a presumption that the suspect did not waive his

rights," and the government bears the burden of proving waiver by a preponderance of the evidence. <u>Carpentino</u>, 948 F.3d at 26.

Defendant does not contest that his waiver was knowing, voluntary, and intelligent. Instead, Defendant argues that his post-Miranda statements should be suppressed as "fruit of the poisonous tree."

The Court must "determine whether the fruits of that Fourth Amendment violation ought to be suppressed." <u>United States v. Mata-Pena</u>, 233 F. Supp. 3d 281, 293 (D.P.R. 2017). "The exclusionary rule has traditionally barred from trial physical, tangible materials obtained either during or as a direct result of an unlawful invasion." <u>Wong Sun v. United States</u>, 371 U.S. 471, 485 (1963). However, the "exclusion of evidence does not automatically follow from the fact that a Fourth Amendment violation occurred." <u>Davis v. United States</u>, 564 U.S. 229, 244 (2011) (citations omitted). Rather, the exclusionary rule applies only where its purpose, namely to "deter future Fourth Amendment violations[,]" is "effectively advanced." <u>Id.</u> at 236-237, 244.

To trigger the exclusionary rule, the police conduct at issue must be sufficiently deliberate, reckless, grossly negligent, or consist of a recurring or systemic negligence, so that the deterrence achieved by suppressing evidence is worth the price paid by the justice system. <u>Herring v. United States</u>, 555 U.S. 135, 144 (2009). On the contrary, "when the police act with an

Criminal No. 24-279 (RAM)                                      30

objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way[.]" Davis, 564 U.S. at 238 (quotations and citations omitted).

As to the questioning prior to the Miranda waiver at 12:40 p.m. on August 1, 2024 and the unwarranted search of the black Nissan Sentra, the record does not reflect that the DEA agents had an objectively reasonable, good-faith belief that their conduct was lawful. The agents who testified were aware that they did not have a warrant to search Defendant's vehicle and they concede that they did not have probable cause to believe there was a weapon in the vehicle. Further, the Government provides no justification for the unwarned interview that occurred in the unmarked vehicle prior to 12:40 p.m. In the absence of evidence or testimony to support their contention that the unwarned statements and warrantless evidence seized were acquired lawfully, the Court concludes that they must be suppressed.

However, as to Defendant's statements after the 12:40 p.m. and 5:15 p.m. waivers, the Court finds no evidence that they were tainted by his pre-Miranda statements. The First Circuit has established that "[a]bsent evidence of a deliberate strategy to circumvent Miranda, [. . .]post-warning statements are admissible if knowingly and voluntarily made." United States v. Faust, 853

F.3d 58 (2017). Defendant does not plead a concerted DEA agent effort to circumvent Miranda, nor does he challenge the validity of his Miranda rights waivers. Moreover, the record does not support either contention. Defendant also challenges the search and seizure of his cellphone. However, at 12:58 p.m. on August 1, 2024, Defendant signed a consent for his cellphone to be searched and provided the password for it. (Docket No. 119 at 15). Defendant does not contest the validity of his consent nor does he plead if and how it was tainted by DEA agents' prior unlawful search of his vehicle and their unwarned questions. In light of these facts, the Court finds no basis to exclude it. Therefore, all of Mr. Siberón-Flusa's statements after his Miranda waivers were lawfully obtained. The search and seizure of his cellphone was similarly lawful.

## VI.  CONCLUSION

In accordance with the above, the Court hereby **GRANTS IN PART** Defendant's *Motion to Suppress* at Docket No. 90. Furthermore, the Court **SUPPRESSES** the following statements and physical evidence that the police acquired on August 1, 2024: Defendant's statements about the whereabouts of a gun made during his arrest; Defendant's statements while he sat in an unmarked vehicle before being given Miranda warnings at 12:40 p.m.; and a stolen Glock pistol, G19, 9mm, bearing serial number BHKD576, with a thirty-three (33) round extended 9-millimeter Glock magazine containing thirty-one (31)

Criminal No. 24-279 (RAM)                                              32

rounds of 9-millimeter ammunition inserted into the pistol with an
empty chamber recovered from under the driver seat of the black
Nissan Sentra.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 12th day of February 2025.

S/RAÚL M. ARIAS-MARXUACH
UNITED STATES DISTRICT JUDGE